IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


ADDIE STOVER                                                                              PLAINTIFF

VS.                                                CIVIL ACTION NO.  2:05CV388KS-MTP

HATTIESBURG PUBLIC SCHOOL DISTRICT                              DEFENDANT


**<u>MEMORANDUM OPINION AND ORDER</u>**

This cause is before the court on defendant Hattiesburg Public School District's motion

for summary judgment.  From its review of all matters made a part of the record of this case as

well as applicable law, and being thus fully advised in the premises, the court finds that the

motion for summary judgment should be granted in part and denied in part.  The court

specifically finds as follows:

<u>FACTUAL BACKGROUND</u>

Plaintiff Addie Stover, an African-American female, commenced this action on June 23,

2005.  In her Amended Complaint, Ms. Stover, a former employee of defendant Hattiesburg

Public School District ("HPSD")  asserts race and gender discrimination claims and a retaliation

claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, and a claim

under the Equal Pay Act, 29 U.S.C. § 206(d)(1).

Ms. Stover was hired by HPSD in June 1996 as a temporary secretary for the Associate

Superintendent and Personnel Director, Jimmy Hopkins.[1]  Ms. Stover has a Bachelor of Art

---

[1]  Ms. Stover claims that she was actually hired by Dr. Gordon Walker, then-
Superintendent of HPSD.

degree in English and has no additional degrees or certificates.[2]  At the time of her hiring, Ms.

Stover earned approximately $12,945.   Ms. Stover's duties as a personnel secretary included:

answering the telephone; giving and receiving applications; providing general assistance to the

personnel director; coordinating information for meetings; discussing employment matters with

staff; and discussing licensure options with prospective employees who were seeking educational

licensure.  Ms. Stover was subsequently asked by Mr. Hopkins to stay on at HPSD as a

permanent employee.  After she was hired, Ms. Stover submitted a resume to Dr. Walker and

also to Mr. Hopkins so that in case an opening for a different position became available or an

opportunity for promotion existed in her current position, she would be considered.  Ms. Stover

told Mr. Walker that she was interested in seeking career advancement at HPSD.

On April 1, 1997, plaintiff's job title changed[3] and her salary was increased to $24,000 a

year.  A college degree was not necessary for this position.[4]   In this new position, plaintiff's

duties included the following:  issuing employment contracts to teachers and administrators at the

---

[2]  Ms. Stover has partially completed a Master's in Business Administration and is planning to pursue a Master's of Education and Adult Education.  She has never been certified by the Mississippi Department of Education to be an administrator in a school system.

[3]  According to plaintiff, she was promoted and her job title changed to Administrative Assistant to the Superintendent of Education.  Defendant denies that this was ever plaintiff's official title.  In several school district directories, Ms. Stover is listed as "Administrative Assistant to Superintendent & Associate Superintendent."  But in a resume prepared by plaintiff after assuming her new position, she listed her title as "Assistant, Administration and Records" - which is consistent with Mr. Hopkins' description of her title. After she filed the instant lawsuit, Dr. Davis and Mr. Hopkins changed Ms. Stover's title to "Administrative Specialist."  At any rate, as discussed below, job titles are not determinative in Title VII or Equal Pay Act cases; the relevant inquiry is focused on the actual job requirements themselves.

[4] The HPSD listing for this position states that only a high school diploma and experience and/or specialized training are required, and that some college is preferred.

2

direction of the Superintendent; monitoring personnel contracts; answering the telephone, giving and receiving applications, providing general assistance to the personnel director, coordinating information for meetings, discussing employment matters with staff, and discussing licensure options with prospective employees who were seeking educational licensure; computing budgets; planning, coordinating and keeping minutes for school board meetings and setting special agendas; maintaining the EEOC information on the school; maintaining statistical data for the HPSD; training new school board members; communicating with the public; communicating with federal and state officials; compiling statistical data; writing grant proposals; preparing the school district calendar and doing legal research regarding the same; maintaining school district deeds and leases; communicating with state and federal officials; establishing the School Safety Department and coordinating with the police and sheriff's departments; and facilitating criminal background investigations and fingerprint sessions.  According to Ms. Stover, she took on additional duties and responsibilities as well, subsequent to this promotion.

In September 2003, HPSD hired Alan Oubre as an administrative assistant to the Superintendent of Schools.[5]  HPSD contends that this position must be filled by a licensed administrator (Ms. Stover does not hold such a license).  Ms. Stover disputes that this position requires a license[6] and also alleges that Mr. Oubre was not licensed at the time he was hired.

---

[5] Mr. Oubre's original job title was "Central Office Administrative Coordinator."  He is now the "Executive Director of Support Services."

[6] Ms. Stover states that she checked with the State of Mississippi and learned that no license is required.

Mr. Oubre found out about the job from an email he received from Dr. Perrin Lowrey[7] advising him that Dr. Davis wanted to speak with him.  This position was not advertised by HPSD.  The reason, according to Dr. Davis, was because HPSD knew what it was looking for, and because of the urgency of their need and how long it would have taken to get someone into place, it would have been a waste of time to advertise.

Mr. Oubre holds a B.S. in English and Psychology, a Master's degree in Educational Administration, a teaching certificate in English, a specialist's certificate in Education Administration and is currently working on obtaining a Ph.D.[8]  Mr. Oubre had no prior experience at HPSD nor in administration at any other school.  Mr. Oubre's starting salary was $48,380.  For the 2004-2005 school year his salary was $62,845.  On July 1, 2005 Mr. Oubre was given a raise to approximately $70,000.  As of July 1, 2006, Mr. Oubre's salary is approximately $79,000.  Mr. Oubre's direct supervisor at HPSD is the Superintendent of Schools, who was Dr. Davis until Dr. Annie Wimbish took over in 2005.

HPSD contends that Mr. Oubre's job responsibilities at HPSD have included: handling energy matters for the school district; overseeing board policy revisions; chairing the Quality Learning Time Committee; assisting the district test coordinator with district testing; reviewing and reviewing and rewriting job descriptions; overseeing the activities of the attendance officers; writing grants; monitoring non-employee contracts; supervising the technology department;

---

[7] Dr. Lowery was Mr. Oubre's main instructor at the University of Southern Mississippi while Mr. Oubre was earning his Education Administration degree.  Dr. Lowery was formerly the Assistant Superintendent for Curriculum Instruction at HPSD.

[8] Mr. Oubre completed his Master's Degree shortly after starting work at HPSD and received his specialist's certificate in the summer of 2005, at which point he began working on his Ph.D.

coordinating special projects; representing the superintendent's office as required; attending cabinet and board meetings; attending executive sessions of board meetings; assisting the director of transportation; recommending the hiring and firing of individuals; serving as the hearing officer for all due process hearings involving expulsions and suspensions of students; interacting with school board lawyers regarding the disposal of property, compulsory attendance laws and due process; handling zoning and city planning cases; and appearing before the City Council on behalf of the school district.[9]

HPSD contends that Mr. Oubre's position was previously held by two women: from 1996 to 2001 it was held by Dr. Tressie Harper, a white female, who holds a Ph.D. in Educational Leadership, and before Dr. Harper it was held by Dr. Leila Alcorn, another white female who holds a Ph.D. According to Ms. Stover, however, Mr. Oubre assumed *her* duties and did not assume the duties of these two other women who had been gone from HPSD for over two years before Mr. Oubre was hired. In fact, Ms. Stover alleges that *she* is the one who assumed Dr. Harper's duties upon her departure - for example, attending the monthly principals' meetings with Dr. Davis.

According to Mr. Hopkins, there was a "significant difference" between Mr. Oubre's and Ms. Stover's jobs in terms of functions, levels of responsibility, authority, skills and credentials. These differences include: Mr. Oubre's position is an exempt executive cabinet level position, while Ms. Stover's position was a classified position at the clerical administrative support level;

---

[9] Many of these functions are listed in job descriptions for Mr. Oubre's position prepared by Mr. Oubre shortly after being hired, and by Dr. Davis at the end of 2004. During his deposition, Mr. Oubre testified that several of these job responsibilities were not actually performed by him.

there was little, if any, overlap between the functions performed by Ms. Stover and Mr. Oubre; a number of administration-level employees reported to Mr. Oubre, including the Technology Coordinator, the Data Manager and the Web and Applications Developer, while no one reported to Ms. Stover;[10] Mr. Oubre has administrative decisionmaking authority and has the responsibility for providing directions to licensed teachers and administrators in special programs and project areas as such as educational technology and energy, while Ms. Stover does not have administrative decisionmaking authority; Mr. Oubre is one of four employees who serve as members of the Superintendent's Advisory Cabinet, a small, closed group representing key administrative offices and has a cabinet meeting with the Superintendent every week, while Ms. Stover was not a member of the Cabinet;[11] Mr. Oubre had discretionary decision-making authority to carry out his duties as Administrative Assistant to the Superintendent and was third in rank for executive decisionmaking in the entire school district, whereas Ms. Stover had no such discretionary decisionmaking authority;[12] Mr. Oubre works pursuant to a written contract of employment, while Ms. Stover was an at-will employee with no written contract of

---

[10] Ms. Stover contends that this is untrue and that several employees reported to her, such as the school resource officers.

[11] Ms. Stover states that before Mr. Oubre was hired, she would attend and make presentations at monthly principals' meetings, but that after he was hired she was not allowed to attend these monthly meetings.

[12] Ms. Stover alleges that after she complained of her discriminatory treatment, HPSD sought to bolster Mr. Oubre's position to make him look more prestigious than he really was. She alleges that she did have discretionary authority with respect to salary issues, certain contract issues and certain criminal background issues.

employment;[13] and Mr. Oubre is exempt from overtime and does not punch a time clock, whereas Ms. Stover was non-exempt from overtime and punched a time clock.[14]

According to Ms. Stover, however, there was substantial overlap between her and Mr. Oubre's job duties and that after she raised concerns about potential discrimination, many of her duties were taken away and given to Mr. Oubre, particularly after she raised concerns about discrimination.[15]  Ms. Stover alleges that according to Dr. Davis, the only reason Mr. Oubre was hired was to handle the overflow of work that Ms. Stover did not have time to deal with.  Ms. Stover also contends that many of Mr. Oubre's job functions were not actually performed  by him. Both Mr. Oubre and Ms. Stover both had the title "administrative assistant" on a sign outside their respective office doors.  Both were provided laptops for working on the weekends.

According to defendant, for most of her tenure at HPSD, Ms. Stover reported to Mr. Hopkins and was his subordinate.  All of her requests for expenditures and leave were approved by him.  Ms. Stover disputes this and argues that she reported directly to the Superintendent, but that after she complained about discrimination, her status was changed.

---

[13] Ms. Stover argues that both she and Mr. Oubre had one year contracts.  She contends that the Board Minutes setting forth her annual salary constitutes a written contract of employment.

[14] Ms. Stover contends that although she had originally been on the time clock, at some point Dr. Davis directed the person responsible for time clocks to take her off because she was an administrative employee rather than a secretarial employee.  Ms. Stover contends that only after Mr. Oubre was hired and she began to complain of discriminatory treatment was she required to punch a time clock again, and that Dr. Davis had no recollection of having taken her off and in fact accused her of taking herself off and arbitrarily not clocking in.

[15] Mr. Oubre admits that he has assumed various duties during his tenure at HPSD, but he did not know whose duties they were previously - whether Ms. Stover's or someone else's. However, one duty he thought he assumed from Ms. Stover, however, was board policy revisions.

7

According to Ms. Stover, Mr. Hopkins said to her on more than one occasion that he was concerned that there were so few white men working in the office where she and Mr. Oubre worked.[16]  Ms. Stover also alleges that Mr. Hopkins told her, in response to her requests for a raise, that if she were white, he might be able to get more done.[17]  Ms. Stover also states that during a budget meeting in the fall of 2003, when Ms. Stover was told that Mr. Oubre was being hired, Mr. Hopkins told Dr. Davis in her presence that Mr. Oubre's hiring was a potential Equal Pay Act violation and that they could not call him "administrative assistant" because that was Ms. Stover's title, and in response Dr. Davis said that they would just call Mr. Oubre something other than "administrative assistant."  According to Ms. Stover, Mr. Hopkins also stated, with respect to an female African-American coach who had complained about pay disparity, that she would never coach again.  Ms. Stover also alleges that Mr. Hopkins told her that while female employees were not comfortable with all the black employees in the central office.  She also alleges that Mr. Hopkins told her that he had not even received an application for Mr. Oubre, but that another white male employee had told him he had convinced Superintendent Davis to hire Mr. Oubre because the white employees were intimidated by all the black employees in the central office.

Ms. Stover also contends that although she requested permission from Dr. Davis starting in 2001 to alter her work schedule so that she could attend classes, her requests were denied, while Mr. Oubre was permitted to take classes towards his degree.  Mr. Oubre admits that he took classes while working at HPSD for at least one semester, and that he received his specialist's

---

[16] Mr. Hopkins denies ever making such a statement.

[17] Again, Mr. Hopkins denies ever making such a statement.  Ms. Stover elsewhere alleges that she was told by both Mr. Davis and Mr. Hopkins that without a license, they could not pay her more than she was earning.

certification in 2005.  According to Mr. Hopkins, Ms. Stover was allowed by Dr. Davis to take classes while working but at some point in 2003 or 2004 her work began to suffer and he discontinued this.

In the summer of 2004, Ms. Stover made an oral grievance in person to Mr. Hopkins and told him that she felt that Mr. Oubre's hiring was a violation of the Equal Pay Act and she asked what the school district would do regarding her concern.  Ms. Stover followed up with Mr. Hopkins several times but did not receive a response.  Subsequently, Ms. Stover had a conversation with Sam Buchanan, a member of the Board at that time.  Ms. Stover told Mr. Buchanan that Mr. Oubre had been hired and paid twice her salary and given some of her duties.[18] Mr. Buchanan told Ms. Stover he would investigate, and he then spoke with Dr. Davis.  Dr. Davis responded that HPSD was operating in good faith.  Ms. Stover also spoke to Ann Chapman, another member of the Board.  Ms. Chapman allegedly told Ms. Stover that when Mr. Oubre was hired, a lengthy discussion had taken place during an executive session of the Board meeting, during which Ms. Chapman asked Dr. Davis why he needed two administrative assistants and Dr. Davis responded that Ms. Stover was inundated with work and needed the help.[19]

Ms. Stover also contends that there was no investigation done by HPSD of Ms. Stover's complaints about discrimination.  Mr. Oubre testified that he did not recall either Dr. Davis or Mr. Hopkins investigating Ms. Stover's complaint.  HPSD contends, however, that Ms. Stover never

---

[18] Mr. Buchanan testified that he did not recall that Ms. Stover's complaint related to Mr. Oubre specifically or that she mentioned discrimination in any way.  He just recalled her complaining that she felt she was being underpaid.

[19] Ms. Chapman avers in her affidavit that she never spoke with Ms. Stover regarding the matter of Mr. Oubre being hired and was not even a member of the Board at that time and did not participate in any executive sessions where the subject of Mr. Oubre's hiring was discussed.

filed a formal complaint and that the first time they were aware of her grievance was when they received the formal EEOC Charge.  HPSD avers that Ms. Stover's claims were handled immediately through outside counsel.

Ms. Stover contends that after she complained about discrimination (but before she filed her formal EEOC Charge) HPSD began retaliating against her and that the alleged retaliation worsened after the EEOC Charge and lawsuit were filed.  For example, she contends that her job performance was consistently satisfactory and often complimented before she complained about Mr. Oubre being hired and that nothing negative about her job performance was said until after she complained about Mr. Oubre;[20] and she contends that she was no longer allowed to attend various administrative meetings and retreats.[21]

On August 10, 2004, Dr. Davis and Mr. Hopkins met with Stover to discuss performance issues she was allegedly experiencing.  On August 16, 2004, Ms. Stover filed a Charge of Discrimination with the EEOC.

Shortly after filing her EEOC Charge, Ms. Stover went on maternity leave from October 2004 through February 2005.  The record reflects that upon her return from maternity leave, she was warned by Dr. Davis in person and in writing regarding her excessive absenteeism and cautioning her that her salary could be docked.  These issues apparently continued through 2005.  In addition, issues arose regarding Ms. Stover's job performance - specifically, her failure to

---

[20]  Mr. Hopkins admitted that there was nothing negative in Ms. Stover's personnel file from 1997 until 2003.  Mr. Buchanan, who has known Ms. Stover for 10 years, testified in his deposition that he was unaware of any issues regarding her job performance.

[21]  Mr. Hopkins testified that Ms. Stover attended monthly principals' meetings until Dr. Wimbish came in July 2005.  Mr. Oubre testified that Ms. Stover did not attend any administrative retreats after he was hired.

correct numerous salary discrepancies.

On April 11, 2005, Ms. Stover received her Notice of Right to Sue letter from the EEOC and filed this lawsuit on June 23, 2005.  On June 30, 2005, plaintiff filed an additional Charge of Discrimination with the EEOC alleging retaliation and adding a gender discrimination claim.

In July 2005, Dr. Annie Wimbish took over as Superintendent.  The record reflects that Dr. Wimbish made numerous attempts to address Ms. Stover's grievances and held weekly meetings with Ms. Stover to discuss her job.  Ms. Stover contends that the alleged retaliation and discrimination continued through 2005 and early 2006, until she stopped working at HPSD on April 19, 2006.  Ms. Stover contends she was constructively discharged, while HPSD contends that she resigned.[22]  At the time she left HPSD, Ms. Stover was earning approximately $37,248 per year.

<u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  The moving

---

[22] In a letter to Dr. Wimbish dated April 19, 2006, Ms. Stover wrote: "The working conditions have become even more intolerable and unbareable [*sic*].  Consequently, I have no choice but to leave my position."

11

party, however, need not negate the elements of the non-movant's case.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) *(citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to show with "'significant probative' evidence" that a genuine issue of material fact actually exists.  *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994) (citation omitted).  To overcome summary judgment, the non-movant may not rest on the pleadings, but must identify specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case."  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.  "The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial."  *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1996) (citation omitted).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence...will be insufficient" to defeat a properly supported motion for summary judgment.).  "[C]onclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."  *Douglass*, 79 F.3d at 1429 (citation omitted).  The non-movant must "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.

When deciding a motion for summary judgment, the evidence submitted by the

nonmoving party is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the party opposing summary judgment. *Anderson*, 477 U.S. at 255. The district court, therefore, "must not resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (internal citation omitted). Summary judgment is improper where the court merely believes it unlikely that the nonmovant will prevail at trial. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5th Cir. 1962). By contrast, summary judgment for the moving party is only proper when a rational factfinder, looking at the record as a whole, could not find for the nonmoving party. *Matsushita*, 475 U.S. at 587.

Finally, the Fifth Circuit admonishes that "[w]hen dealing with employment discrimination cases, which usually necessarily involve examining motive and intent, ... granting of summary judgment is especially questionable. In these cases 'summary judgment should be used cautiously and all procedural requirements given strict adherence....' " *Hayden v. First Nat'l Bank*, 595 F.2d 994, 997 (5th Cir. 1979) (*quoting Lavin v. Illinois High School Ass'n*, 527 F.2d 58, 61 (7th Cir. 1975)); *see also Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 641 (5th Cir. 1985) (Motivation and intent often are proved only "through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder.").

<u>ANALYSIS</u>

<u>Title VII Claims</u>

<u>Race and Gender Discrimination</u>

Under Title VII, it is unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to...compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A Title VII plaintiff has "the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994) (*quoting Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 358 (1977)).

In order to make out a *prima facie* case of intentional discrimination, a plaintiff may use either direct or circumstantial evidence.  *Portis*, 34 F.3d at 328 (citation omitted).  Where there is direct evidence of discrimination, the burden of proof shifts to the employer to show that the same decision(s) would have been made regardless of the "forbidden factor."  *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).  Direct evidence is that which proves discriminatory animus without the need for inference or presumption.  *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993), *reh'g denied*, 995 F.2d 225 (5th Cir. 1993); *see also EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) (in order to constitute direct evidence of discrimination, statement "must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions.").  Direct evidence of discrimination may include statements made by the employer which prove a discriminatory motive on their face.  *See Fabela*, 329 F.3d at 415-16; *Jones v. Overnight Transp. Co.*, 2006 WL 3627148, at * 2 (5th Cir. Dec. 13, 2006).  The employee need not prove that an improper criterion was the sole basis for the challenged action; merely that it was at least part of the challenged action.  *See Fabela*, 329 F.3d at 415-16.  In order for comments in the workplace to constitute direct evidence of

14

discrimination, they must be: 1) related to the protected class of persons of which plaintiff is a member; 2) proximate in time to the challenged employment action; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue. *Krystek v. Univ. of S. Mississippi*, 164 F.3d 251, 256 (5th Cir. 1999) (*citing Brown v. CSI Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).

Plaintiff offers a number of statements allegedly made by Mr. Hopkins and Dr. Davis and contends that they are direct evidence of discrimination.  Plaintiff alleges that Mr. Hopkins said to her on more than one occasion that he was concerned that there were so few white men working in the office where she and Mr. Oubre worked, that white female employees were not comfortable with all the black employees in the office, and that he had not even received an application for Mr. Oubre, but that another white male employee had told him he had convinced Dr. Davis to hire Mr. Oubre because the white employees were intimidated by all the black employees in the office. These are not direct evidence of discrimination because they require this court to draw an inference between the statements and the challenged actions.  *See Jones*, 2006 WL 3627148, at *3 (alleged statements of supervisor that he wanted to "get rid of all the blacks" and supervisor's alleged request that staffing agency send white drivers instead of black drivers not direct evidence of discrimination because they "require[d] the trier of fact to infer a nexus" between the statements and the alleged acts of discrimination and because they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination); *see also Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733 (5th Cir. 1999) (holding that job interviewer's statement that plaintiff's age caused him "concern" was not direct evidence of age discrimination in employer's decision not to hire plaintiff because an additional inference of discrimination was required).

15

Next, plaintiff alleges that Mr. Hopkins told Dr. Davis in her presence that Mr. Oubre's hiring was a potential Equal Pay Act violation and that they could not call him "administrative assistant" because that was Ms. Stover's title, and in response Dr. Davis said that they would just call Mr. Oubre something other than "administrative assistant."  This is not direct evidence of discrimination because it relates to job title, not to job function, which is the determinative issue in a Title VII case.  Moreover, these comments merely reflect Mr. Hopkins' and Dr. Davis' perception of the situation, rather than constituting direct evidence of the reality.  *See Krystek*, 164 F.3d at 254, 256 (university dean's alleged remark, in gender discrimination case, that "[t]here are different standards for males and females," represented his "perception of how tenure decisions were being made at that time" and did not constitute direct evidence of discrimination.); *see also Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1218 (5th Cir. 1995) (former supervisor's alleged statement that plaintiff would have a "good case of age discrimination" not direct evidence of age discrimination).

Plaintiff also alleges that Mr. Hopkins told her, in response to her requests for a raise, that if she were white, he might be able to get more done.  Again, this is not direct evidence of discrimination because it requires this court to infer a nexus between the statement and the challenged actions.  *See Jones*, 2006 WL 3627148, at *3; *see also Haas*, 168 F.3d at 733. Moreover, it merely reflects Mr. Hopkins' "perception" of the situation, not that this was actually the case.  *See Kyrstek*, 164 F.3d at 256.

Ms. Stover then alleges that Mr. Hopkins stated, with respect to an female African-American coach who had complained about pay disparity, that she would "never coach again." This is not direct evidence of discrimination because it does not even relate to Ms. Stover's

16

employment at HPSD nor to any of the challenged employment actions at issue in this case.  *See Krystek*, 164 F.3d at 256; *see also Jones*, 2006 WL 3627148, at * 3.  Moreover, it is vague because it does not indicate that the reason why this coach would never coach again was because of her complaint - *i.e.*, it requires an additional inference.  *See Jones*, 2006 WL 3627148, at * 3; *see also Haas*, 168 F.3d at 733.

Finally,  Ms. Stover alleges that upon her complaining to the Board, Ms. Chapman, a Board member, asked why Dr. Davis needed "two administrative assistants," and Dr. Davis responded that Ms. Stover "was already inundated with other tasks, and that he needed the help." Again, this is not direct evidence because it requires the court to infer a nexus between the statement and the challenged actions.  *See Jones*, 2006 WL 3627148, at * 3; *see also Haas*, 168 F.3d at 733.

Where there is no direct evidence of discrimination, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.  *Fabela*, 329 F.3d at 415 (citation omitted).  Under that standard, in order to make out a *prima facie* case of disparate treatment discrimination under Title VII,  plaintiff must show that: 1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) others similarly situated were more favorably treated.  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001) (citations omitted).[23]  The parties do not dispute whether Ms. Stover is a member of a protected class (she is

---

[23] If plaintiff establishes her *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action.  *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (citations omitted); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1179 (5th Cir. 1990).  If the employer meets this burden, plaintiff must then demonstrate that the proffered reason is a mere pretext for discrimination.  *Rhodes*, 75 F.3d

both female and an African-American), nor do they dispute that she was qualified for her position.

Thus, the court will focus only on the third and fourth prongs of plaintiff's *prima facie* case.

In the Fifth Circuit, adverse employment actions include only "ultimate employment decisions...'such as hiring, granting leave, discharging, promoting, and compensating.'" *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000) (citation omitted); *see also Banks v. E. Baton Rouge Parish Sch. Bd.,* 320 F.3d 570, 575 (5th Cir. 2003) ("holding that "an employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action."); *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995) ("Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."). Therefore, actionable adverse employment actions are generally limited to "tangible employment action[s] [that] constitute [ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly differing responsibilities, or a decision causing a significant change in benefits." *Veal v. Schlumberger Tech. Corp.*, 2006 WL 237006, at * 7 (S.D. Tex. Jan. 31, 2006) (citations omitted) (brackets in original).  Plaintiff alleges that she was paid less than Mr. Oubre because of her race and/or gender.  Plaintiff also alleges that she was not considered for Mr. Oubre's position and that the process of hiring Mr. Oubre was discriminatory.  These are clearly ultimate employment decisions as they relate to compensation and to hiring.[24]

---

at 993; *Smith*, 819 F.2d at 1179.

[24] Plaintiff also argues that Mr. Oubre was allowed to attend school while working in order to obtain certificates and licenses, while she was not similarly allowed.  This could be considered an ultimate employment decision if such a denial would have had more than a tangential effect upon some ultimate employment decision, such as a raise or a promotion. However, none of plaintiff's other allegations - such as negative performance reviews, hostility

The court now turns to the fourth prong of plaintiff's *prima facie* case - that others similarly situated were more favorably treated. *Okoye*, 245 F.3d at 514-15 (citing cases). In order to establish this prong, plaintiff and her alleged comparator must be similarly situated with respect to their job titles, job duties, responsibilities, qualifications and experience. *See, e.g., Tucker v. SAS Inst., Inc.*, 2006 WL 3227313, at * 6 (N.D. Tex. Nov. 7, 2006); *Aucoin v. Kennedy*, 2006 WL 2700711, at * 5-6 (E.D. La. Sept. 19, 2006); *Caesar v. Lamar Univ.*, 147 F.Supp. 2d 547, 553 (E.D. Tex. 2001). The parties vehemently dispute whether or not Ms. Stover and Mr. Oubre were similarly situated. There is evidence in the record that Ms. Stover and Mr. Oubre performed similar duties and that their job functions overlapped and that Mr. Oubre assumed some of Ms. Stover's duties during her employment at HPSD. There is also evidence in the record demonstrating differences between Mr. Oubre's and Ms. Stover's jobs. At certain times Mr. Oubre and Ms. Stover apparently shared the same title of "administrative assistant." There is some dispute in the record as to whether both Ms. Stover and Mr. Oubre reported to the Superintendent at various times during the relevant time period. In addition, although Mr. Oubre clearly has more degrees and qualifications than Ms. Stover, Ms. Stover contends that these additional qualifications were not actually required for his position and that at the time he was hired, Mr. Oubre did not have the license HPSD alleges is required for his position. Resolving all factual disputes in plaintiff's favor and viewing the evidence in the light most favorable to the plaintiff, the court finds there is sufficient evidence in the record to establish a genuine issue of

---

from other employees or denial of professional development can support a claim for discrimination. *See, e.g., Dollis*, 77 F.3d at 779-82; *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997); *Arensdorf v. Snow*, 2006 WL 3302532, at * 7 (S.D. Tex. Nov. 13, 2006).

material fact on whether Mr. Oubre and Ms. Stover were similarly situated for the purposes of a Title VII discrimination claim. Therefore, summary judgment for HPSD on plaintiff's race and gender discrimination claims under Title VII is denied.[25]

Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee "because [that employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e-3(a). To survive summary judgment on a Title VII retaliation claim, plaintiff must make a *prima facie* showing that: 1) she engaged in a protected activity;[26] 2) an adverse employment action occurred; and 3) there is a causal link between the protected activity and the adverse employment action. *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003). The establishment of a *prima facie* case gives rise to an inference of retaliation. *Johnson v. Coca-Cola Enters., Inc.*, 2006 WL 2873474, at * 9 (W.D. La. Oct. 6, 2006) (*citing Shackleford*

---

[25] In its reply brief, HPSD asserts the "same actor" defense - that the court should dismiss plaintiff's discrimination claims because the person who hired plaintiff - Mr. Hopkins - is the same person who allegedly discriminated against her. However, as the Fifth Circuit discussed in *Brown v. CSI Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), this is not a defense, but rather an inference that discrimination was not the motive behind a challenged employment action (one that grows stronger where the "same actor" is also in the plaintiff's protected class). Ms. Stover claims that she was not hired by Mr. Hopkins but was hired by then-Superintendent Dr. Gordon Walker, and therefore there is a question as to whether this inference should even apply.

[26] "An employee engages in protected activity by (1) opposing an employment practice made illegal by Title VII..., or (2) if he has 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII....." *Foster v. Solvay Pharms., Inc.,* 160 Fed. Appx. 385, 388 (5th Cir. Dec.23, 2005) (*per curiam*) (*quoting Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996)). Protected activity is not limited to the filing of a formal complaint; it covers an employee's action in expressing its belief that the employer has engaged in discriminatory practices. *See, e.g., Collins v. Mallinckrodt Chem., Inc.*, 959 F.Supp. 1123, 1130 (E.D. Mo. 1996) (citation omitted).

v. DeLoitte & Touche, LLP, 190 F.3d 398, 408) (5th Cir. 1999)).[27]

Retaliation is only actionable if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006) (internal quotations and citations omitted); *see also Peace v. Harvey*, 2006 WL 3068677, at * 1 (5th Cir. Oct. 26, 2006). "Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."'" *Burlington*, 126 S.Ct. at 2417 (citations omitted). An action is usually found "materially adverse" if it is one that directly affects the employee's status, or if it otherwise meets some level of "substantiality." *Smith ex rel. C.R.S. v. Tangipahoa Sch. Bd.*, 2006 WL 3395938, at * 13 n.14 (E.D. La. 2006) (*citing Webb v. Cardiothoracic Surgery Assoc.*, 139 F.3d 532, 540 (5th Cir. 1998)); *Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004), *reh'g & reh'g en banc denied*, 123 Fed. Appx. 388 (11th Cir. 2004), *cert. denied*, 544 U.S. 976 (2005)).

The Supreme Court in *Burlington* recently clarified that the "adverse employment actions" that can support a retaliation claim are broader than those that can support a discrimination claim, holding that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" and is not limited to "so-called 'ultimate employment decisions.'" *Id.* at 2414. Nevertheless, as the *Burlington* court noted, "it is

---

[27] To overcome this retaliatory inference, the defendant must produce evidence of a legitimate, non-retaliatory purpose for the materially adverse action. *Id.* (*citing Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)). If the defendant satisfies its burden of production, the plaintiff must prove the employer's stated reason for the materially adverse action was merely pretext for the real, retaliatory purpose. *Id.* (*citing Gee*, 289 F.3d at 345).

important to separate significant from trivial harms" and an "employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." *Id.* at 2415.

Ms. Stover alleges that the following acts of retaliation occurred after she made her initial oral grievance to Mr. Hopkins and/or the Board or after she filed her formal EEOC Charge and then the instant lawsuit:  Mr. Hopkins, Dr. Davis and the Board refused to investigate her complaint; she was put on the timeclock and told that if she did not clock in, she would be considered insubordinate; the EEOC investigator was "paraded" throughout the building by Mr. Hopkins; Mr. Hopkins exhibited anger and shouted and waved his arms at plaintiff; Mr. Hopkins began insulting her harshly; Mr. Hopkins made comments to her that he has forgotten more than she will ever know; Mr. Hopkins told plaintiff she could only answer him with a yes or a no; she was not allowed time off for educational advancement (unlike Mr. Oubre); instead of reporting to Dr. Davis, she was told to report to Mr. Hopkins; she was not allowed comp time; she was told in the fall of 2005 that she had to be at work by 8:00 a.m. and if she was late her pay would be docked, even though for more than eight years she had arrived at work at 8:30 after dropping her children off at school; some of her job duties were given to Mr. Oubre;[28] she was excluded from administrative retreats, principal's meetings and other executive meetings; the Superintendent's secretary was short and abrupt with her; the staff on the second floor made comments about her getting a "million dollar settlement"; her title changed in the handbook; Dr. Davis did not grant her professional development requests so her memberships in professional organizations lapsed

---

[28] For example, Ms. Stover alleges that Mr. Oubre assumed her duty of making presentations at the monthly principals' meetings, and of helping to raise money for the school district's foundation.

22

and she was not able to go on professional development seminars or conferences; Dr. Davis reduced her budget; she was told by Hopkins and Dr. Davis that she had to complete a FMLA form prior to taking maternity leave (even though this was not enforced and had never been used by any other employee); she received post-it notes from Dr. Davis stating that she made too many mistakes; she was told by Dr. Davis and Mr. Hopkins that she had an attitude problem; and she received negative verbal evaluations by Dr. Davis and Mr. Hopkins regarding her work (although she never had prior to Mr. Oubre being hired).

As defendant argues, most of these actions are too trivial to constitute actionable retaliation - for example, rudeness or stray comments from other employees, the enforcement of workplace rules or other minor day-to-day workplace occurrences. However, other allegations are more serious, such as reduction or reassignment of job duties and negative evaluations (assuming that there was not a legitimate basis for them). The court therefore finds that there is a genuine issue of material fact as to whether a reasonable employee in Ms. Stover's position would have found these actions to be materially adverse.

That does not end the inquiry, however, as plaintiff must also establish causation to make out a *prima facie* case of retaliation. Plaintiff must demonstrate that her "protected activity was a substantial or motivating factor for the adverse employment actions." *McLaurin v. City of Jackson Fire Dep't*, 2006 WL 3794348, at * 1 (Dec. 19, 2006) (citation omitted). In this analysis, "[t]he timing of the adverse employment action can be a significant, although not necessarily determinative, factor." *Mills v. Port Arthur*, 2006 WL 3531460, at * 25 (E.D. Tex. Dec. 4, 2006) (*quoting Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995)). It is important to note that plaintiff's "subjective belief the incidents were retaliatory, without more, is not sufficient

to survive summary judgment." *Peace*, 2006 WL 3068677, at * 2 (citation omitted).  It is also important to keep in mind that "the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case ... Title VII's protection against discrimination does not permit EEOC complainants to disregard work rules or job requirements." *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002).

Ms. Stover alleges that these complained-of actions post-date her oral grievances to Mr. Hopkins and the Board and they grew worse after she filed her formal charge with the EEOC as well as this lawsuit.   There is evidence in the record in the record to support this.  For example, there is evidence that there had been no performance problems on Ms. Stover's part until Mr. Oubre was hired, and that in 2004, 2005 and 2006 there were increasing issues with Ms. Stover's performance being raised by Dr. Davis and Mr. Hopkins.  HPSD argues that Ms. Stover was self-destructing; Ms. Stover argues that she was being retaliated against.  The court finds that there is a genuine issue of material fact as to whether Ms. Stover's protected activity was a substantial or motivating factor for the actions of which she is complaining.  Therefore, summary judgment for defendant on this claim is denied.

Constructive Discharge

Although not raised as a separate claim in her Amended Complaint, plaintiff also appears to be alleging that she was constructively discharged from HPSD.  "To prove constructive discharge, a plaintiff must prove that working conditions are so intolerable that 'a reasonable person would have felt compelled to resign.'" *Easterling v. Sch. Bd. of Concordia Parish*, 196 Fed. Appx. 251, 253 (5th Cir. July 28, 2006) *(citing Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004)).  In order to constitute constructive discharge, the working environment must be

worse than in a hostile work environment claim; it must be "harassment ratcheted up to the breaking point." *Id.* (*citing Suders*, 542 U.S. at 147-48).  The Fifth Circuit has recognized the following list of nonexclusive factors as being relevant in this determination: 1) demotion; 2) reduction in salary; 3) reduction in job responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a younger supervisor; 6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and 7) offers of early retirement that would make the employee worse off regardless of whether the offer was accepted or not.  *Id.* (*citing Barrow v. New Orleans S.S.*, 10 F.3d 292, 297 (5th Cir. 1994)).

The court does not find that any of plaintiff's allegations, discussed *supra*, rise to the level of constructive discharge.  Accordingly, to the extent this is being asserted by plaintiff as a separate claim for relief, summary judgment for defendant is granted.

Equal Pay Act Claim

Under the Equal Pay Act, an employer is prohibited from gender-based discrimination where the jobs performed require equal skill, effort, and responsibility and are performed under similar conditions.  29 U.S.C. § 206(d)(1).  In order to establish a *prima facie* case of discrimination under the EPA, plaintiff must offer proof that she was paid less than a male employee in a similar position under similar working conditions.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Peters v. Shreveport*, 818 F.2d 1148, 1153 (5th Cir. 1987). Unlike a Title VII case, there is no requirement of proof of discriminatory intent or willfulness. *Peters*, 818 F.2d at 1153.  Once the plaintiff establishes a *prima facie* case, the burden of persuasion and production shifts to defendant to demonstrate that the wage disparity is justified

under one of the EPA's four recognized exceptions.[29]  *Peters*, 818 F.2d at 1153.

It is important to keep in mind that resolution of a claim under the EPA "is not dependent on job classifications or titles but depends rather on actual job requirements and performance."  29 C.F.R. § 1620.13(e).  A showing of "equal work" under the EPA does not require that the jobs of the two employees are identical, merely that the "skill, effort and responsibility" required in the performance of the jobs compared are "substantially equal."  *Peters*, 818 F.2d at 1153 (citations omitted); 29 C.F.R. § 1620.13(a).  Although "[w]hat constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined ⋯ [t]he terms constitute separate tests, each of which must be met in order for the equal pay standard to apply."  *EEOC v. TXI Operations, L.P.*, 394 F.Supp. 2d 868, 875 (N.D. Tex. 2005) (*quoting* 29 C.F.R. § 1620.14(a) (2004)).[30]  Moreover, "[i]t should be kept in mind that 'equal' does not mean 'identical.' Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable."  *Id.* (*quoting* 29 C.F.R. § 1620.14(a) (2004)).  "On the other hand, substantial differences, such as those customarily associated with differences in wage levels when the jobs are performed by persons of one sex only, will ordinarily demonstrate an inequality as between the jobs justifying differences in pay."  29 C.F.R. §1620.14(a) (2004).

As discussed above in the discussion of plaintiff's Title VII claims, there is evidence in the

---

[29] The EPA provides exceptions for wage payments made pursuant to:  1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) a differential based upon any factors other than sex.  *See* 29 U.S.C. § 206(d)(1).

[30] With respect to "equal skill," the regulations note that "[p]ossession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill."  29 C.F.R. § 1620.15(a) (2004).

record that Ms. Stover and Mr. Oubre performed similar duties and that their job functions overlapped, and that Mr. Oubre assumed some of Ms. Stover's duties during her employment at HPSD.  There is also evidence in the record demonstrating differences between Mr. Oubre's and Ms. Stover's jobs.  At certain times Mr. Oubre and Ms. Stover apparently shared the same title of "administrative assistant."  There is some dispute in the record as to whether both Ms. Stover and Mr. Oubre reported to the Superintendent at various times during the relevant time period.  In addition, although Mr. Oubre clearly has more degrees and qualifications than Ms. Stover, Ms. Stover contends that these additional qualifications were not actually required for his position. Resolving all factual disputes in plaintiff's favor and viewing the evidence in the light most favorable to the plaintiff, the court finds there is sufficient evidence in the record to establish a genuine issue of material fact on whether Mr. Oubre and Ms. Stover performed equal work within the meaning of the EPA.  Therefore, summary judgment for HPSD on this claim is denied.


IT IS, THEREFORE, ORDERED AND ADJUDGED that HPSD's motion for summary judgment [**# 45**] is granted in part and denied in part.  Plaintiff's claim for constructive discharge is dismissed with prejudice.  Plaintiff's Title VII claims for discrimination and retaliation and plaintiff's claim under the Equal Pay Act are not dismissed.

SO ORDERED and ADJUDGED on this, the 8th day of February, 2007.


*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

27